**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VIDA PIROUZ, On Behalf of Herself and All Others Similarly Situated, | ) Civil Action No. 17-10152 |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) **CLASS ACTION** |
| v. | ) **COMPLAINT FOR** |
| | ) **VIOLATION OF THE** |
| ARIAD PHARMACEUTICALS, INC., | ) **FEDERAL SECURITIES LAWS** |
| PARIS PANAYIOTOPOULOS, | ) |
| ALEXANDER J. DENNER, GEORGE W. | ) **JURY TRIAL DEMANDED** |
| BICKERSTAFF, III, JULES HAIMOVITZ, | ) |
| ANNA PROTOPAPAS, NORBERT G. | ) |
| RIEDEL, and SARAH J. SCHLESINGER, | ) |
| | ) |
| Defendants. | ) |

Plaintiff Vida Pirouz ("Plaintiff"), by and through her undersigned counsel, for her complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This is a class action brought on behalf of the public stockholders of Ariad Pharmaceuticals, Inc. ("Ariad" or the "Company") against Ariad and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer (the "Tender Offer") on a proposed transaction, pursuant to which Ariad will be acquired by Takeda Pharmaceutical

Company Limited ("Takeda") through its indirect wholly-owned subsidiary Kiku Merger Co., Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On January 9, 2016, Ariad issued a press release announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Ariad to Takeda.  Under the terms of the Merger Agreement, Takeda will acquire all outstanding shares of Ariad for $24.00 in cash per share of Ariad's common stock (the "Merger Consideration").  Pursuant to the Merger Agreement, Takeda, through Merger Sub, commenced the Tender Offer on January 19, 2017.  The Tender Offer is scheduled to expire at 11:59 p.m. Eastern Time on February 15, 2017.  The Proposed Transaction is valued at approximately $5.2 billion.

3.      The Proposed Transaction is the result of an unfair process designed to ensure the sale of Ariad to Takeda on terms preferential to defendants and other Company insiders.  The Proposed Transaction is being driven by Ariad insiders who stand to benefit from a substantial financial windfall in connection with the tender of their shares of Ariad common stock, as well as the accelerated vesting of their unvested equity awards.

4.      On January 19, 2017, Ariad filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement, which recommends that Ariad stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the background of the Proposed Transaction and the sale process leading up to the Proposed Transaction; (ii) potential conflicts of interest on behalf of Ariad's financial advisors; (iii) Ariad management's projections, utilized by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan"), Goldman, Sachs & Co. ("Goldman Sachs") and Lazard Frères & Co. LLC ("Lazard") in their financial analyses; and (iv) the valuation analyses performed by J.P. Morgan,

Goldman Sachs and Lazard in connection with the rendering of their fairness opinions.  The failure to adequately disclose such material information constitutes a violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully informed decision whether to tender their shares in support of the Proposed Transaction.

5.      In short, the Proposed Transaction will unlawfully divest Ariad's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the Tender Offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Ariad is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual

Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Ariad.

10.      Defendant Ariad is a Delaware corporation with its principal executive offices located at 125 Binney Street, Cambridge, MA 02142.  Ariad's common stock is traded on the NASDAQ under the ticker symbol "ARIA."

11.      Defendant Paris Panayiotopoulos ("Panayiotopoulos") has been President, Chief Executive Officer ("CEO") and a director of the Company since January 2016.

12.      Defendant Alexander J. Denner ("Denner") is Chairman of the Board and has been a director of the Company since February 2014.  Defendant Denner is the Chief Investment Officer and a founding partner of Sarissa Capital Management LP ("Sarissa Capital"), an investor in the Company that has entered into a tender and support agreement with Takeda, agreeing to tender its shares in favor of the Proposed Transaction.

13.      Defendant George W. Bickerstaff, III ("Bickerstaff") has been a director of the Company since May 2016.

14.      Defendant Jules Haimovitz ("Haimovitz") has been a director of the Company since May 2016.

15.      Defendant Anna Protopapas ("Protopapas") has been a director of the Company since April 2015.  Defendant Protopapas previously served as a member of the Executive Committee of Takeda and as Executive VP of Global Business Development of Takeda from October 2010 to October 2014.  From October 1997 to October 2010, defendant Protopapas held

various positions at Takeda's independent subsidiary, Millennium Pharmaceuticals, Inc. ("Millennium Pharmaceuticals"), including Senior Vice President of Strategy and Business Development and as a member of its Executive Committee.

16.     Defendant Norbert G. Riedel ("Riedel") has been a director of the Company since April 2011.

17.     Defendant Sarah J. Schlesinger ("Schlesinger") has been a director of the Company since July 2013.

18.     Defendants Panayiotopoulos, Denner, Bickerstaff, Haimovitz, Protopapas, Riedel and Schlesinger are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

19.     Takeda is headquartered in Osaka, Japan and is the largest pharmaceutical company in Japan and Asia.  Takeda is focused on metabolic disorders and oncology through its independent subsidiary, Millennium Pharmaceuticals.

20.     Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Takeda.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Ariad common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

23.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of January 13, 2017, there were approximately 194,580,850 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Ariad or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

24.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

(c)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(d)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

25.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

27.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

28.     Ariad is a biotechnology and pharmaceutical company founded in 1991, focused on creating new medicines to advance the treatment of rare forms of chronic and acute leukemia, lung cancer and other rare cancers.  In December 2012, the Food and Drug Administration ("FDA") approved Ariad's leukemia drug, Iclusig (ponatinib), for patients with chronic myeloid leukemia or Philadelphia chromosome-positive acute lymphoblastic leukemia.  In addition to Iclusig, Ariad's product pipeline includes: (1) Brigatinib (previously known as AP26113), an investigational, targeted cancer medicine that is in development for the treatment of patients with anaplastic lymphoma kinase positive ("ALK+") non-small cell cancer (NSCLC) whose disease is resistant to crizotinib; and (2) AP32788, a tyrosine kinase inhibitor ("TKI") designed to address an unmet medical need in a subset of non-small cell lung cancers.

29.     On May 9, 2016, the Company announced it had entered into an agreement with Incyte Corporation ("Incyte") pursuant to which Incyte would acquire Ariad's European operations.  As described in the press release announcing the agreement, "[a]t the close of the transaction, the companies will also enter into a license agreement whereby Incyte will obtain an exclusive license to develop and commercialize Iclusig® (ponatinib) in Europe and other select countries."  The press release further explained that the agreement would allow Ariad to focus on promoting Iclusig in the U.S. market, "while strengthening its financial position and maintaining important optionality through a potential buy-back provision for the Iclusig license rights in the event of a change-in-control of ARIAD. . . ."

30.     The next day, Ariad issued a press release reporting its financial results for the first quarter of 2016, which included significant revenues from sales of Iclusig.  The Company reported net product revenues from sales of Iclusig of $33.6 million, compared to $23.9 million in the first

quarter of 2015, representing a 41% increase.  U.S. sales of Iclusig were $24.9 million for the quarter, compared to $18.7 million in the first quarter of 2015.  Commenting on the financial results, defendant Panayiotopoulos stated:

> Iclusig demonstrated strong performance in both the U.S. and European markets during the first quarter of 2016 compared to the prior year period, primarily driven by increasing demand and new patient growth. Following our major announcement yesterday with Incyte regarding our agreement to divest our European operations and license the commercial rights to Iclusig in Europe, we are on track to complete our strategic review this quarter aimed at delivering patient and shareholder value. We also look forward to the presentation of pivotal, registration data on brigatinib at ASCO, along with our planned filing for marketing approval of brigatinib in the U.S. in the third quarter of this year.

31.     On July 28, 2016, the Company reported its second quarter and first half of 2016 financial results.  Net product revenue from sales of Iclusig continued to increase, reaching $65.3 million, compared to $27.8 million in the second quarter of 2015.  For the first half of 2016, this figure was $99.0 million, compared to $51.7 million in the first half of 2015.  U.S. sales of Iclusig for the quarter were $32.6 million, compared to $21.7 million in the second quarter of 2015, and $57.6 million for the first half of 2016, compared to $40.4 million for the first half of 2015, representing a 43% increase.  GAAP net income for the quarter was $109.8 million, compared to GAAP net loss of $63.2 million in the second quarter of 2015.  For the first half of 2016, GAAP net income was $56.1 million, compared to GAAP net loss of $115.8 million in the first half of 2015.  Defendant Panayiotopoulos commented on the results, noting:

> We had a strong second quarter, during which we initiated a rolling NDA submission for brigatinib based on our data from the ALTA pivotal trial, presented four-year data from the PACE clinical trial for Iclusig, and advanced AP32788 for EGFR/HER2 exon 20 non-small cell lung cancer patients into a Phase 1/2 trial. We also strengthened our financial position through our agreement with Incyte and the strong sales performance of Iclusig. Our teams are focused on Iclusig growth, preparations for the potential launch of brigatinib in the U.S. and driving forward our promising pipeline.

32.     On November 7, 2016, Ariad reported its third quarter 2016 financial results.  The Company reported worldwide net product revenue from sales of Iclusig of $34.3 million for the quarter, a 25% increase from $27.5 million in the third quarter of 2015.  U.S. net product revenue from sales of Iclusig were $33.6 million, compared to $20.3 million in the third quarter of 2015.  GAAP net loss for the quarter was $27.8 million, compared to GAAP net loss of $55.5 million for the third quarter of 2015.  Defendant Panayiotopoulos commented on the third quarter's results, stating:

> During the third quarter, ARIAD achieved several important milestones that further our commitment as a small, research-based biotechnology company to patients with rare cancers, including those with no other targeted treatment options available.  Iclusig was approved in Japan and we received priority review from the FDA for brigatinib in crizotinib-treated ALK+ non-small cell lung cancer. We are continuing to invest heavily in R&D and to progress in enrolling in the OPTIC, OPTIC-2L and ALTA-1L trials for Iclusig and brigatinib, as well as our clinical trial for AP32788, a novel kinase inhibitor for a rare form of lung cancer involving mutations in the EGFR and HER2 genes, and for which there are currently no approved targeted treatments.

**The Flawed Sale Process**

33.     In the spring of 2015, the Company had preliminary discussions with Takeda regarding a potential licensing transaction for the Company's AP26113 product (now termed brigatinib) and entered into a confidentiality agreement with Takeda.

34.     Then, in the fall of 2015, the Company had preliminary discussions about a possible sale of the Company and entered into related confidentiality agreements with several industry participants (including Takeda).

35.     In the spring of 2016, Ariad engaged in preliminary discussions regarding a potential licensing transaction for ARIAD's ponatinib (Iclusig) product in certain European jurisdictions with multiple industry participants (including Takeda) and entered into a confidentiality agreement with Takeda.

36.     During 2016 the Company also undertook a process to explore potential partnerships with respect to the marketing and commercialization of brigatinib outside the U.S.  In connection with this process, Ariad contacted 21 pharmaceutical companies with an oncology presence outside the U.S., including Takeda.  Following discussions with 11 of the companies, Ariad received non-binding proposals from six, including Takeda.

37.     Certain of these companies, including Takeda, indicated an interest in a broader global partnership with respect to brigatinib.  Following Takeda's November 29, 2016 indication of such an interest, defendant Panayiotopoulos indicated to the Takeda representatives that, although the Company was not actively pursuing a broader transaction, defendant Panayiotopoulos would discuss any proposal with the Board.

38.     On December 9, 2016, the Company received a non-binding offer letter from Takeda indicating that Takeda would be interested in pursuing a transaction to acquire the Company for all-cash consideration at $20.00 per share.  In the letter, Takeda indicated that it was prepared to complete its diligence on the Company expeditiously and strongly desired to enter into a definitive agreement with the Company before January 9, 2017.

39.     At a December 12 and 13, 2016 Board meeting, the Board reviewed Takeda's non-binding offer, next steps with respect to its response to Takeda and a possible outreach to other parties.  The Board also considered the potential engagement of J.P. Morgan as an outside financial advisor to the Company, and the fact that an affiliate of J.P. Morgan was a counterparty to certain note hedge and warrant transactions (the "note hedge and warrant transactions") entered into by the Company on June 12, 2014 in connection with the issuance of its outstanding Convertible Notes.  The Board further considered that the unwinding of the note hedge and warrant transactions in connection with a proposed transaction could result in a net payment due to or from the

Company or J.P. Morgan's affiliate, as well as certain potential economic benefits under such affiliate's hedge positions relating to the note hedge and warrant transactions that J.P. Morgan's affiliate could realize if a proposed transaction occurred.[1]  Despite the potential conflict of interest, the Board approved the engagement of J.P. Morgan as the Company's financial advisor.  The Board also directed defendant Panayiotopoulos and J.P. Morgan to contact three industry participants (referred to in the Recommendation Statement as Companies 1-3) and to invite them to participate in management meetings with a view toward submitting an acquisition proposal on an expedited timeframe if they wished to do so.

40.     Between December 18 and December 22, 2016, the Company entered into confidentiality agreements with Takeda, Company 2 and Company 3.  The confidentiality agreements included standstill provisions for, with respect to Takeda and Company 2, a period of two years, and with respect to Company 3, a period of eighteen months.  The Recommendation Statement is silent as to whether these standstill provisions contained "don't-ask, don't waive" provisions which preclude the parties from requesting any waiver of the live standstill provisions to submit a topping bid for the Company post-signing.

41.     On December 21, 2016, representatives of the Company's senior management and J.P. Morgan held a management meeting with representatives of Company 2.

42.     On December 22, 2016, Takeda submitted an updated non-binding offer to acquire the Company for $22.00 in cash per share.  The updated proposal contemplated an announcement of the transaction no later than January 9, 2017.

---

[1] Although J.P. Morgan and Ariad terminated the note hedge and warrant transactions on January 8, 2017, in connection with the termination and related unwinding of related hedging and other market transactions, J.P. Morgan and its affiliates realized a currently estimated net gain (after taking into account any hedging gains or losses) of approximately $29,000,000 to $34,000,000.

43. On the morning of December 23, 2016, representatives of the Company's senior management and J.P. Morgan held a management meeting with representatives of Company 3.

44. Later that day, at a meeting of the Board's Coordination Committee, comprised of defendants Protopapas, Denner and Panayiotopoulos (the "Coordination Committee"), the Company's senior management reported to the Coordination Committee that Company 2 had indicated that it was not interested in pursuing a transaction, and that Company 1 and Company 3 had not yet provided any substantive feedback.

45. On the evening of December 23, 2016, at the direction of the Coordination Committee, defendant Panayiotopoulos informed Christophe Weber ("Weber"), Takeda's President and CEO, that, while the Company would evaluate Takeda's offer, the Coordination Committee was not prepared at that time to recommend to the Board that the Company accept Takeda's proposal. At the Board's direction, defendant Panayiotopoulos further indicated to Weber that if Takeda were to submit a further revised proposal with an offer price in the "mid $20s," the Coordination Committee would be supportive of moving forward with Takeda.

46. On December 24, 2016, Weber informed defendant Panayiotopoulos that Takeda would be submitting a "best and final" revised offer of $24.00 per share. Weber also insisted on the Company and Takeda entering into an exclusivity agreement covering the period through January 9, 2017, during which, among other things, the Company would be prohibited from soliciting alternative proposals from other parties. Takeda submitted its revised non-binding proposal shortly thereafter.

47. The Board met on December 25, 2016 to consider Takeda's latest non-binding offer from December 24, 2016. Despite the outstanding interest from Company 1 and Company 3, the Board authorized the grant of exclusivity to Takeda until January 9, 2017 and authorized the

Coordination Committee and the Company's advisors to proceed with negotiations with Takeda.

48.     The next day, Takeda and Ariad entered into an exclusivity agreement, whereby the Company granted Takeda a period of exclusivity until January 9, 2017 (the "Exclusivity Agreement").

49.     Apparently unaware of Ariad's exigent timeline to sell the Company or the Exclusivity Agreement, on December 27, 2016, Company 3 submitted a list of due diligence questions to Ariad.  Pursuant to the Exclusivity Agreement, Ariad ignored Company 3.

50.     On January 6, 2017, the Company engaged Goldman Sachs and Lazard as outside financial advisors in connection with the transaction.

51.     At a January 8, 2017 Board meeting, following a review of each of J.P. Morgan, Goldman Sachs and Lazard's respective financial analyses, the Board approved the Merger Agreement.  Takeda and Ariad executed the Merger Agreement shortly thereafter.

**The Proposed Transaction**

52.     On January 9, 2017, the Company issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> CAMBRIDGE, Mass.--Jan. 9, 2017-- ARIAD Pharmaceuticals (NASDAQ:ARIA) ("ARIAD") today announced it has entered into a definitive agreement to be acquired by Takeda Pharmaceutical Company Limited (TSE: 4502) ("Takeda") under which Takeda will acquire all of the outstanding shares in ARIAD for $24.00 per share in cash, or a total enterprise value of approximately $5.2 billion, representing a premium of approximately 75 percent over ARIAD's closing price on January 6, 2017.
>
> Under the terms of the agreement, ARIAD stockholders will receive $24.00 in cash for each share of ARIAD common stock they own. The transaction has been approved unanimously by the boards of directors of both companies, and is expected to close by the end of February 2017, subject to required regulatory approvals and other customary closing conditions.

* * *

"The acquisition of ARIAD is a unique opportunity that will enable us to positively impact the lives of more patients worldwide, advance our strategic priorities and generate attractive returns for our shareholders," said Christophe Weber, president and chief executive officer of Takeda. "This is a very exciting time for Takeda as we will broaden our hematology portfolio and transform our global solid tumor franchise through the addition of two innovative targeted therapies. Opportunities to acquire such high-quality, complementary targeted therapies do not come often, and we are very excited about the potential for this transaction to benefit patients, our shareholders and other stakeholders."

Under the terms of the agreement, the acquisition is structured as an all cash tender offer for all of the outstanding shares of ARIAD common stock, followed by a merger in which remaining shares of ARIAD would be converted into the right to receive the same $24.00 cash per share price paid in the tender offer.

The transaction is subject to the tender of a majority of ARIAD common stock on a fully diluted basis as well as other customary closing conditions, including expiration of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the antitrust laws of applicable foreign jurisdictions. The transaction is expected to close by the end of February 2017.

### Insiders' Interests in the Proposed Transaction

53.     Takeda and Ariad insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Ariad.

54.     Company insiders stand to reap a substantial financial windfall for securing the deal with Takeda.  The following table sets forth the cash payments certain named executive officers and directors stand to receive from their outstanding shares of Company common stock:

| Name of Executive Officer or Director | Number of Shares (#) | Cash Consideration for Shares ($) |
|---|---|---|
| Alexander J. Denner, Ph.D. (1) | 13,831,249 | $ 331,949,976 |
| George W. Bickerstaff, III | — | — |
| Jules A. Haimovitz | — | — |
| Paris Panayiotopoulos | 192,678 | $ 4,624,272 |
| Anna Protopapas | 23,902 | $ 573,648 |
| Norbert G. Riedel, Ph.D. | 121,859 | $ 2,924,616 |
| Sarah J. Schlesinger, M.D. (2) | 53,100 | $ 1,274,400 |
| Timothy P. Clackson, Ph.D. | 200,144 | $ 4,803,456 |
| Manmeet S. Soni | 2,735 | $ 65,640 |
| Daniel M. Bollag, Ph.D. | 111,686 | $ 2,680,464 |

| | | | |
|---|---|---|---|
| Hugh M. Cole | 42,834 | $ | 1,028,016 |
| Jayne M. Gansler | — | | — |
| Jennifer L. Herron | — | | — |
| Elona Kogan, Esq. | — | | — |
| **All of our current directors and executive officers as a group** | **14,580,187** | **$** | **349,924,488** |

55.    Moreover, pursuant to the Merger Agreement, each outstanding option, restricted stock unit, performance stock unit, and restricted share will vest and be converted into the right to receive cash payments.  For example, after serving as Ariad's CEO for only a little over a year, defendant Panayiotopoulos alone stands to receive over $27.9 million in connection with the vesting of his equity awards.  The following table summarizes the cash payments the named executive officers and directors stand to receive in connection with their vested and unvested options:

| Name of Executive Officer or Director | Number of Shares Subject to Vested Options (#) | Weighted-Average Exercise Price Per Share ($) | | Cash Consideration for Vested Options ($) | Number of Shares Subject to Unvested Options (#) | Weighted Average Exercise Price Per Share ($) | | Cash Consideration for Unvested Options ($) | | Total Cash Consideration for Options in Merger ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| Alexander J. Denner, Ph.D. | 100,000 | $ 7.21 | $ | 1,679,500 | 25,000 | $ 8.73 | $ | 381,750 | $ | 2,061,250 |
| George W. Bickerstaff, III | — | — | | — | 75,000 | $ 6.65 | $ | 1,301,250 | $ | 1,301,250 |
| Jules A. Haimovitz | — | — | | — | 75,000 | $ 6.65 | $ | 1,301,250 | $ | 1,301,250 |
| Paris Panayiotopoulos | 375,000 | 5.34 | | 6,997,500 | 1,125,000 | $ 5.34 | $ | 20,992,500 | $ | 27,990,000 |
| Anna Protopapas | 50,000 | $ 6.89 | $ | 855,500 | 50,000 | $ 8.87 | $ | 756,500 | $ | 1,612,000 |
| Norbert G. Riedel, Ph.D. | 100,000 | $ 6.81 | $ | 1,718,750 | — | — | | — | $ | 1,718,750 |
| Sarah J. Schlesinger, M.D. | 115,000 | $ 11.37 | $ | 1,452,050 | — | — | | — | $ | 1,452,050 |
| Timothy P. Clackson, Ph.D. | 147,000 | $ 17.63 | $ | 936,050 | 87,125 | $ 6.51 | $ | 1,523,816 | $ | 2,459,866 |
| Manmeet S. Soni | — | — | | — | 550,000 | $ 6.47 | $ | 9,641,500 | $ | 9,641,500 |
| Daniel M. Bollag, Ph.D. | 86,000 | $ 18.31 | $ | 489,380 | 60,000 | $ 6.51 | $ | 1,049,400 | $ | 1,538,780 |
| Hugh M. Cole | 50,000 | $ 6.40 | $ | 880,000 | 128,000 | $ 6.47 | $ | 2,244,220 | $ | 3,124,220 |
| Jayne M. Gansler | — | — | | — | 144,000 | $ 8.86 | $ | 2,180,160 | $ | 2,180,160 |
| Jennifer L. Herron | — | — | | — | 300,000 | $ 8.85 | $ | 4,545,000 | $ | 4,545,000 |
| Elona Kogan Esq. | — | — | | — | 200,000 | $ 7.13 | $ | 3,374,000 | $ | 3,374,000 |

56.    Further, if they are terminated in connection with the Proposed Transaction, Ariad's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation, as set forth in the following table:

| Name(1) | Cash ($)(2) | Equity ($)(3) | Perquisites/ Benefits ($)(4) | Total ($) |
|---|---|---|---|---|
| ***Named Executive Officers*** | | | | |
| Paris Panayiotopoulos | 2,210,000 | 22,595,700 | 51,635 | 24,857,335 |

| | | | |
|---|---|---|---|
| Harvey J. Berger, M.D. | — | — | — | — |
| Manmeet S. Soni | 950,000 | 15,401,500 | 38,726 | 16,390,226 |
| Edward M. Fitzgerald | — | — | — | — |
| Timothy P. Clackson, Ph.D. | 1,589,723 | 8,360,048 | 30,516 | 9,980,287 |
| Martin J. Duvall | — | — | — | — |
| Thomas J. DesRosier, Esq. | — | — | — | — |

## The Recommendation Statement Contains Numerous Material Misstatements or Omissions

57.    On January 19, 2017, defendants filed the materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Ariad's stockholders.  The Recommendation Statement fails to disclose material information stockholders need in order to make a fully informed decision with respect to tendering their shares, including, as discussed below, material information concerning (i) the background of the Proposed Transaction and the sale process leading up to the Proposed Transaction; (ii) potential conflicts of interest on behalf of Ariad's financial advisors; (iii) Ariad management's projections, utilized by the Company's financial advisors in their financial analyses; and (iv) the valuation analyses performed by J.P. Morgan, Goldman Sachs and Lazard in connection with the rendering of their fairness opinions.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

58.    The Recommendation Statement omits the following material information concerning the background of the Proposed Transaction and the sales process.

59.    The Recommendation Statement fails to expressly indicate whether the confidentiality agreements entered into between the Company and several industry participants in the fall of 2015 contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these industry participants from making a topping bid for the Company.  Similarly, the Recommendation Statement fails to disclose whether the confidentiality agreements that contained standstill provisions entered into between

the Company and each of Company 2 and Company 3 contained "fall-away" provisions that would allow each of Company 2 and Company 3 to submit a superior proposal to acquire the Company or whether the standstill provisions are still in effect and are "don't-ask-don't-waive" standstill provisions that are presently precluding Company 2 and Company 3 from making a topping bid for the Company. Such information is material to Ariad stockholders as a reasonable Ariad stockholder would find it material and important to their decision to tender their shares whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

60.    In addition, the Recommendation Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Ariad's officers and directors, including who participated in all such communications.

61.    The Recommendation Statement also fails to disclose whether any parties (in addition to Company 3) contacted Ariad regarding a potential transaction or interest in the Company during the exclusivity period with Takeda.

62.    The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)    From page 18 of the Recommendation Statement:

In the fall of 2015, the Company had preliminary discussions about a possible sale of the Company and entered into related confidentiality agreements with several industry participants (including Takeda) but none of the industry participants submitted a formal offer.

(b)    From page 21 of the Recommendation Statement:

On December 20, 2016, the Company and Company 2 entered into a confidentiality agreement and a customary standstill agreement (with a term of two years) in connection with the sharing of certain confidential information of the Company.

* * *

Also on December 22, 2016, the Company and Company 3 entered into a confidentiality agreement (which included customary standstill provisions for a period of eighteen months) in connection with the sharing of certain confidential information of the Company with Company 3.

      (c)     From page 23 of the Recommendation Statement:

On December 26, 2016, the Company and Takeda entered into the Exclusivity Agreement, whereby the Company granted Takeda a period of exclusivity until January 9, 2017 (the "exclusivity period"). See "Item 3. Past Contacts, Transactions, Negotiations and Agreements—Arrangements with Purchaser and Parent and their Affiliates—Exclusivity Agreement."

On December 27, 2016, Company 3 submitted a list of due diligence questions to the Company. Due to the Exclusivity Agreement with Takeda, the Company was unable to respond to Company 3.

**Materially Incomplete and Misleading Disclosures Concerning Potential Banker Conflicts**

63.    The Recommendation Statement sets forth that Goldman Sachs has provided certain financial advisory and/or underwriting services to Takeda and/or its affiliates.  The Recommendation Statement fails to disclose the nature of such services, including whether, in connection with the financial advisory services provided to Takeda and/or its affiliates, Goldman Sachs provided financial analyses with respect to an acquisition of Ariad by Takeda, and if so, whether Goldman Sachs provided Takeda with any potential price terms for such an acquisition.

64.    Additionally, the Recommendation Statement sets forth that Lazard has in the past two years provided certain investment banking services to the Company, but fails to provide the compensation provided to Lazard by the Company for these services.  The Recommendation Statement further fails to disclose whether Lazard has provided any services to Parent or its affiliates in the past two years, and if so, the nature of those services and the amount of compensation it earned for those services.

65.     Moreover, the Recommendation Statement states that, in the past two years, J.P. Morgan has received aggregate fees from the Company in the amount of approximately $1.1 million and from Parent approximately $1.4, yet states that "neither J.P. Morgan nor its affiliates have had any other material financial advisory or other material commercial or investment banking relationships with the Company or Parent."  The Recommendation Statement fails to disclose the nature of the past services rendered to the Company and Parent, and the basis for the statement that such relationships were not "material."

66.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     From page 44 of the Recommendation Statement:

During the two year period ended January 6, 2017, Goldman Sachs has received compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to the Company and/or its affiliates of approximately $2 million. Goldman Sachs also has provided certain financial advisory and/or underwriting services to Parent and/or its affiliates from time to time. However, during the two year period ended January 6, 2017, Goldman Sachs has not received compensation for any such services. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to the Company, Parent and their respective affiliates for which its Investment Banking Division may receive compensation.

(b)     From page 50 of the Recommendation Statement:

Lazard has in the past two years provided certain investment banking services to the Company . Lazard, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, leveraged buyouts, and valuations for estate, corporate and other purposes.

**Materially Incomplete and Misleading Disclosures Concerning the Company's Financial Projections**

67.     The Recommendation Statement does not disclose the following information

concerning Ariad management's financial projections:

(a)    The Recommendation Statement sets forth that in the normal course of its financial planning, management of the Company prepared and provided to the Board, J.P. Morgan, Goldman Sachs and Lazard the projections, but fails to disclose the specific time period when the projections were created by Ariad management;

(b)    The Recommendation Statement sets forth that the projections were probability-adjusted, but fails to disclose the quantification of the probabilities, assigned by Company management, of achieving regulatory success and/or commercial success with its products and the sources of the quantification of the probabilities assigned by Company management;

(c)    The non-probability-adjusted financial forecasts for the fiscal years 2017 through 2038;

(d)    The probability of success adjusted estimates of the free cash flows to be generated from each of the Company's products (Iclusig, Brigatinib, NDC AP32788, PAN-Kit Inhibitor and Immuno-Kinase Program) provided by Ariad management and utilized by Goldman Sachs to perform its *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis* and J.P. Morgan to perform its sum-of-the-parts *Discounted Cash Flow Analysis*;

(e)    The non-probability-adjusted estimates of the free cash flows to be generated from each of the Company's products (Iclusig, Brigatinib, NDC AP32788, PAN-Kit Inhibitor and Immuno-Kinase Program);

(f)    The separate constituents making up total operating expenses, including but not limited to cost of goods sold, stock-based compensation expense, SG&A, and R&D; and

(g)    A reconciliation of all GAAP to non-GAAP metrics.

68.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     From pages 31-33 of the Recommendation Statement:

In the normal course of its financial planning, management of the Company prepared and provided to our Board of Directors, J.P. Morgan, Goldman Sachs and Lazard projections and directed each of J.P. Morgan, Goldman Sachs and Lazard to use the projections in connection with the rendering of its fairness opinion to our Board of Directors and performing its related financial analysis, as described above under the heading "—Opinions of Financial Advisors". The Company did not provide forecasts or projections to Parent or Purchaser or any other potential transaction counterparty.

\* \* \*

The projections while presented with numerical specificity necessarily were based on numerous variables and assumptions that are inherently uncertain and many of which are beyond the control of our management. Because the projections cover multiple years, by their nature, they become subject to greater uncertainty with each successive year. The projections for 2017 through 2038 were based on a long range planning model that management prepared and provided to our Board, J.P. Morgan, Goldman Sachs and Lazard. The projections presented below are probability-adjusted and took into account several assumptions. The primary assumptions included in these projections were growth in the numbers of patients using our products, price by year for each product, and duration of treatment for each product. The projected number of patients using each product in turn depends on assumptions about the clinical data and approved label for each product, the epidemiology of each disease/indication, the market share each product achieves, and the competitive environment. Important factors that may affect actual results and result in the projections not being achieved include, but are not limited to the pricing and reimbursement environment for cancer therapeutics, new competitors and technologies not currently foreseen, decisions by regulatory authorities, and other risk factors described in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2015, subsequent quarterly reports on Form 10-Q and current reports on Form 8-K. In addition, the projections may be affected by the Company's ability to achieve strategic goals, objectives and targets over the applicable period. Accordingly, there can be no assurance that the projections will be realized, and actual results may vary materially from those shown.

\* \* \*

The projections provided by management and presented to the Board of Directors, J.P. Morgan, Goldman Sachs and Lazard on January 8, 2017 included projections from 2017 to 2038 for probability-adjusted revenue, operating income, EBITDA and Unlevered Cash Flow. The following is a summary of the projections:

*( dollars in millions )*

| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total revenue | $422 | $453 | $531 | $812 | $952 | $1,264 | $1,619 | $1,829 | $1,969 | $2,022 | $2,096 | $2,195 | $2,175 | $2,214 | $1,611 | $1,300 | $1,108 | $590 | $439 | $177 | $88 | $0 |
| Total operating expenses (1) | 323 | 336 | 335 | 313 | 317 | 306 | 354 | 408 | 429 | 431 | 439 | 451 | 458 | 463 | 333 | 285 | 242 | 165 | 140 | 32 | 16 | 0 |
| Operating income | $99 | $117 | $196 | $499 | $635 | $958 | $1,265 | $1,421 | $1,540 | $1,592 | $1,657 | $1,744 | $1,717 | $1,751 | $1,277 | $1,015 | $866 | $425 | $299 | $146 | $72 | $0 |
| % of revenue | 24% | 26% | 37% | 61% | 67% | 76% | 78% | 78% | 78% | 79% | 79% | 79% | 79% | 79% | 79% | 78% | 78% | 72% | 68% | 82% | 82% | 0% |
| Depreciation & Amortization | $14 | $15 | $17 | $26 | $30 | $40 | $51 | $57 | $62 | $63 | $65 | $68 | $67 | $68 | $49 | $40 | $34 | $18 | $13 | $5 | $3 | $0 |
| EBITDA (2) | $113 | $132 | $213 | $525 | $665 | $998 | $1,316 | $1,478 | $1,602 | $1,655 | $1,722 | $1,811 | $1,784 | $1,819 | $1,326 | $1,055 | $900 | $443 | $313 | $150 | $75 | $0 |
| Taxes (3) | $0 | $0 | $0 | $0 | $0 | ($191) | ($335) | ($443) | ($497) | ($539) | ($557) | ($580) | ($610) | ($601) | ($613) | ($447) | ($355) | ($303) | ($149) | ($105) | ($51) | $0 |
| Capital Expenditures | ($13) | ($14) | ($16) | ($24) | ($29) | ($38) | ($49) | ($55) | ($59) | ($61) | ($63) | ($66) | ($65) | ($66) | ($48) | ($39) | ($33) | ($18) | ($13) | ($5) | ($3) | $0 |
| Change in Working Capital | ($14) | ($14) | ($5) | ($4) | ($14) | ($7) | ($16) | ($18) | ($10) | ($7) | ($3) | ($4) | ($5) | $1 | $2 | $30 | $16 | $2 | $24 | $8 | $4 | $0 |
| Unlevered Free Cash Flow (4) | $86 | $116 | $193 | $487 | $438 | $609 | $807 | $915 | $997 | $1,034 | $1,076 | $1,130 | $1,119 | $1,138 | $861 | $676 | $565 | $300 | $202 | $103 | $52 | $0 |

The following table shows a reconciliation of Unlevered Free Cash Flow to operating income for the periods indicated:

*( dollars in millions )*

| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unlevered Free Cash Flow (4) | $86 | $116 | $193 | $487 | $438 | $609 | $807 | $915 | $997 | $1,034 | $1,076 | $1,130 | $1,119 | $1,138 | $861 | $676 | $565 | $300 | $202 | $103 | $52 | $0 |
| Depreciation & Amortization | ($14) | ($15) | ($17) | ($26) | ($30) | ($40) | ($51) | ($57) | ($62) | ($63) | ($65) | ($68) | ($67) | ($68) | ($49) | ($40) | ($34) | ($18) | ($13) | ($5) | ($3) | $0 |
| Taxes (3) | $0 | $0 | $0 | $0 | $0 | $191 | $335 | $443 | $497 | $539 | $557 | $580 | $610 | $601 | $613 | $447 | $355 | $303 | $149 | $105 | $51 | $0 |
| Capital Expenditures | $13 | $14 | $16 | $24 | $29 | $38 | $49 | $55 | $59 | $61 | $63 | $66 | $65 | $66 | $48 | $39 | $33 | $18 | $13 | $5 | $3 | $0 |
| Change in Working Capital | $14 | $14 | $2 | $4 | $14 | $7 | $16 | $18 | $10 | $7 | $3 | $4 | $5 | ($1) | ($2) | ($30) | ($16) | ($2) | ($24) | ($8) | ($9) | ($4) | $0 |
| Operating income | $99 | $117 | $196 | $499 | $635 | $958 | $1,265 | $1,421 | $1,540 | $1,592 | $1,657 | $1,744 | $1,717 | $1,751 | $1,277 | $1,015 | $866 | $425 | $299 | $145 | $72 | $0 |

## Materially Incomplete and Misleading Disclosures Concerning the Financial Analyses Performed by Ariad's Financial Advisors

69.     The Recommendation Statement contains J.P. Morgan's, Goldman Sachs' and Lazard's written fairness opinions, and describes the various valuation analyses J.P. Morgan, Goldman Sachs and Lazard performed in support of their opinions.  However, the description of J.P. Morgan's, Goldman Sachs' and Lazard's opinions and analyses fail to include key inputs and assumptions underlying the analyses.  Without this information, as described below, Ariad's public stockholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on their fairness opinions rendered in support of the Proposed Transaction.

70.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose:  (i) the unlevered free cash flows for each of the

Company's existing and pipeline products, for the 22-year period ending on December 31, 2028, provided by Ariad management and utilized by J.P. Morgan to perform its analysis; (ii) the individual inputs and assumptions used to calculate the discount rate range utilized by J.P. Morgan; (iii) the terminal values calculated by J.P. Morgan to arrive at an implied platform value for the Company; (iv) the implied pricing multiples corresponding to the terminal value growth rate of 0%; (v) the present value of the stock-based compensation expense, discovery research and development expenses, COGS absorption and cash tax savings from net operating losses; and (vi) the revenues from the Company's licensing agreement with Medinol Ltd. ("Medinol").

71.     With respect to Goldman Sachs' *Illustrative WholeCo Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the individual inputs and assumptions used to calculate the discount rate range utilized by Goldman Sachs; (ii) the net debt of the Company as of September 20, 2016; and (iii) the inputs and assumptions used to determine the perpetuity growth rate range of 1.0% to 3.0%.

72.     With respect to Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the probability of success adjusted estimates of the free cash flows to be generated from each of the Company's products (Iclusig, Brigatinib, NDC AP32788, PAN-Kit Inhibitor and Immuno-Kinase Program) provided by Ariad management and utilized by Goldman Sachs to perform its analysis; (ii) the individual inputs and assumptions used to calculate the discount rate range utilized by Goldman Sachs; (iii) the estimates of the benefits to be derived by the Company from its utilization of its net operating losses; (iv) the range of illustrative negative values for certain expenses that had not been allocated to specific products; and (v) the net debt figure used in the analysis.

73.     With respect to Lazard's *Discounted Cash Flow Analysis*, the Recommendation

Statement fails to disclose: (i) the individual inputs and assumptions used to calculate the discount rate range utilized by Lazard; and (ii) the estimates of the benefits to be derived by the Company from its utilization of its net operating losses.

74.    With respect to Lazard's *Precedent Transactions Analysis*, the Recommendation Statement fails to disclose the individual multiples for the transactions observed by Lazard in its analysis.

75.    The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)    From page 37 of the Recommendation Statement:

J.P. Morgan performed the discounted cash flow analysis of the Company, based on projections prepared by the management of the Company relating to its business, for each of its existing and pipeline products, and from its license agreement with Medinol Ltd. (" Medinol "), for the calendar years 2017 through 2038. As instructed by Company management, J.P. Morgan used probability-adjusted financial projections prepared by Company management that took into account the probabilities, assigned by Company management, of achieving regulatory success and/or commercial success with its products.

In arriving at the implied fully diluted equity value per share of Common Stock on a standalone basis, J.P. Morgan calculated, based on the financial projections prepared by the management of the Company relating to its business, the unlevered free cash flows that the Company is expected to generate from each of its existing and pipeline products during the 22-year period ending on December 31, 2038. The unlevered free cash flows, as well as revenues from the Company's license agreement with Medinol, stock-based compensation expense, discovery research and development expenses, COGS absorption and cash tax savings from net operating losses were then discounted to present values as of December 31, 2016, using a range of discount rates from 11.0% to 13.0%. The discount rate was selected based on the most recent financial information provided by the Company to J.P. Morgan. The discount rate range was based upon J.P. Morgan's analysis of the weighted average cost of capital of the Company. J.P. Morgan also calculated the implied "platform value" of the Company's business by assigning a hypothetical terminal value to each existing and pipeline product, in each case calculated as of two years after the loss of exclusivity for such product. J.P. Morgan also calculated a terminal value for future stock-based compensation expense, discovery research

and development expenses and COGS absorption, in each case calculated as of 2035. Each of these terminal values was then discounted to present value, and then aggregated to arrive at an implied platform value. J.P. Morgan then aggregated the present value of each of the unlevered cash flows, stock-based compensation expense, discovery research and development expenses, COGS absorption, revenues from the Company's license agreement with Medinol, and cash savings from net operating losses together with the implied platform value to derive a firm value. The firm value was further adjusted by adding the Company's net cash to derive an implied equity value. For purposes of its analysis, J.P. Morgan assumed a valuation date of December 31, 2016.

Based on the foregoing, J.P. Morgan derived an implied fully diluted equity value per share range for the Company, on a standalone basis, rounded to the nearest $0.25, of between $20.00 and $23.25, which J.P. Morgan compared to the proposed cash consideration per Share of $24.00 in cash.

(b)     From pages 41-42 of the Recommendation Statement:

*Illustrative WholeCo Discounted Cash Flow Analysis*

Using the Forecasts, Goldman Sachs performed an illustrative discounted cash flow, or "DCF," analysis to derive a range of illustrative present values per Share. Using mid-year convention and discount rates ranging from 13.0% to 15.0%, reflecting estimates of the weighted average cost of capital of the Company, Goldman Sachs discounted to present value as of September 30, 2016, the date of the last balance sheet of the Company publicly available at the time Goldman Sachs rendered its opinion to the Board of Directors, (a) probability of success adjusted estimates of the unlevered free cash to be generated by the Company for the period from January 1, 2017 to December 31, 2038, as reflected in the Forecasts, and (b) a range of illustrative terminal values for the Company, which were calculated by applying perpetuity growth rates ranging from 1.0% to 3.0% to a probability of success adjusted estimate of the unlevered free cash flow to be generated by the Company for a terminal year of 2026 as reflected in the Forecasts. Goldman Sachs then derived ranges of illustrative enterprise values for the Company by adding the ranges of present values it derived as described above.

Goldman Sachs then subtracted from the range of illustrative enterprise values it derived for the Company the Net Debt of the Company as of September 30, 2016 to derive a range of illustrative equity values for the Company. Goldman Sachs then divided the range of illustrative equity values it derived for the Company by the total number of fully diluted shares of the Company outstanding calculated based on the Shares and other equity securities outstanding as of January 6, 2017 as provided by Company management, to derive a range of illustrative present values per Share ranging from $17.87 to $23.84.

*Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis*

25

Using the Forecasts, Goldman Sachs performed an illustrative sum-of-the-parts DCF analysis to derive a range of illustrative present values per Share.

In connection with this analysis, Goldman Sachs performed separate DCF analyses with respect to the following products and items of the Company:

- Iclusig (consisting of Iclusig 1L, Iclusig 2L, Iclusig 3L, Iclusig 4L, Iclusig T315I+, Iclusig PH+ ALL and Iclusig rest of the world, or "ROW," royalties);

- Brigatinib (consisting of Brigatinib 1L, Brigatinib 2L, Brigatinib 3L, Brigatinib 4L & ROS-1 and Brigatinib ROW royalties);

- NDC AP32788;

- PAN-Kit Inhibitor; and

- Immuno-Kinase Program.

Using a mid-year convention and discount rates ranging from 13.0% to 15.0%, reflecting estimates of the Company's weighted average cost of capital, Goldman Sachs discounted to present value as of September 30, 2016, probability of success adjusted estimates of the free cash flows to be generated from each product described above for the period from January 1, 2017 to December 31, 2038, all as reflected in the Forecasts, to derive a range of illustrative enterprise values for each product. The Forecasts assumed that Iclusig and Brigatinib would not generate cash flow after 2035 due to expiration of their patents and, as such, for purposes of its analysis, Goldman Sachs assumed that there would be no terminal value for these products as of 2035. The Forecasts also assumed that NDC AP32788, PAN-Kit Inhibitor and Immuno-Kinase Program would not generate cash flows after 2038, and, as such, for purposes of its analysis, Goldman Sachs assumed that there would be no terminal value for these products as of as of 2038.

Using the discount rates described above, Goldman Sachs also discounted to present value as of September 30, 2016, (i) estimates of the benefits to be derived by the Company from its utilization of its net operating losses as reflected in the Forecasts to derive a range of illustrative values for the Company's net operating losses and (ii) certain expenses and revenues of the Company reflected in the Forecasts that had not been allocated to specific products, including discovery-related R&D, stock based compensation, financial impact of Medinol collaboration, capital expenditures and related depreciation and amortization to derive a range of illustrative negative values for these expenses.

Goldman Sachs then divided (i) each of the ranges of illustrative values it derived for each product of the Company, the Company's net operating losses and the

Company expenses referenced above and (ii) the Net Debt of the Company as of September 30, 2016, by the total number of fully diluted Shares of the Company outstanding calculated based on the Shares and other equity securities outstanding as of January 6, 2017 as provided by the Company management, to derive a per Share value for each such item.

Goldman Sachs then added together the per share values it derived for each such product and items listed above and subtracted the per share value it derived for the Net Debt to derive a range of illustrative present values per Share of the Company ranging from $15.81 to $18.13.

(c)      From page 47 of the Recommendation Statement:

*Discounted Cash Flow Analysis.* Using the probability-adjusted projections and assumptions relating to the Company's future performance prepared by management of the Company and furnished to Lazard for the purposes of its financial analysis, which we refer to as the Company Projections and which are summarized above under "—Certain Unaudited Prospective Financial Information", Lazard performed a discounted cash flow analysis of the Company.

A discounted cash flow analysis is a valuation methodology used to derive a valuation of a company by calculating the present value of the company's estimated future cash flows. A company's "estimated future cash flows" are its projected unlevered free cash flows, and "present value" refers to the value today or as of an assumed date of the future cash flows or amounts and is obtained by discounting the estimated future cash flows or amounts by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, capital structure, income taxes, expected returns and other appropriate factors.

Lazard calculated the present value of the aggregated unlevered free cash flows that the Company, based upon the Company Projections, is expected to generate from each of its existing and pipeline products, the Company's license agreement with Medinol, stock-based compensation expense, discovery research and development expenses, COGS absorption, and cash tax savings from net operating losses, during the remainder of 2017 and for fiscal years 2018 through 2038. The Company Projections assumed that the Company would not generate cash flow after 2037, based upon the expiration of certain of the Company's patents and other assumptions. Therefore, for the purposes of its analysis, Lazard assumed that there would be no terminal value for the Company as of 2038. To calculate the present value of the unlevered free cash flows, Lazard used a discount rate range of 12.0% to 14.0%, which was chosen by Lazard based upon its analysis of the weighted average cost of capital of the Company. Lazard adjusted for net debt (cash) and derived an overall equity value for the Company that, when divided by the number of fully diluted Shares of Common Stock outstanding provided by Company management, resulted in a range of implied equity values per Share of Common Stock of $18.25 to $21.00 (rounded to the nearest $0.25).

(d)     From page 48 of the Recommendation Statement:

*Precedent Transactions Analysis*. Using publicly available information, Wall Street research and FactSet Research Systems, Lazard reviewed and analyzed selected precedent transactions involving companies in the biopharmaceutical industry that Lazard viewed as generally relevant in evaluating the Offer and the Merger. In performing these analyses, Lazard analyzed certain financial information and transaction multiples relating to companies in the selected transactions and compared such information to the corresponding information for the Offer and the Merger.

Specifically, Lazard reviewed three merger and acquisition transactions in the biopharmaceutical industry announced since January 1, 2013, that Lazard deemed relevant to consider in relation to the Company and the Offer and the Merger. These transactions are listed below. Although none of the selected precedent transactions or the target companies in such transactions is directly comparable to the Offer and the Merger or to the Company, all of the transactions were chosen because they involve transactions that, for the purposes of this analysis, may be considered similar to the Offer and the Merger and/or involve targets that, for the purposes of analysis, may be considered similar to the Company.
The precedent transactions Lazard selected for this analysis were as follows:

| Announcement Date | Acquiror | Target |
|---|---|---|
| August 22, 2016 | Pfizer Inc. | Medivation, Inc. |
| March 4, 2015 | AbbVie Inc. | Pharmacyclics, Inc. |
| August 25, 2013 | Amgen Inc. | Onyx Pharmaceuticals, Inc. |

Using data regarding the precedent transactions and the target companies available from FactSet Research Systems, Wall Street research and public filings, Lazard examined the selected transactions with respect to the enterprise value implied for the target company in the transaction (calculated as the equity purchase price in the selected transaction plus the book value of any debt and preferred equity, less cash and cash equivalents and short term investments, plus the book value of minority interests of the target company as last publicly reported by the target company in its public filings prior to the announcement of the applicable transaction) as a multiple of the target company's three- and four-year forward revenues, which are referred to as "EV/ FY+3 Revenue" and "EV/FY+4 Revenue", respectively, as reflected in publicly available consensus estimates at the time of the transaction announcement. Using its professional judgment and experience, Lazard then selected the lowest and highest EV/ FY+3 Revenue and EV/ FY+4 Revenue multiples for the selected precedent transactions, which ranged from 5.4x to 8.6x for EV/ FY+3 Revenue and 4.0x to 7.0x for EV/ FY+4 Revenue. Lazard then applied these reference ranges to the Company's estimated revenues for 2019 and 2020, respectively, from the Company Projections. This analysis indicated the following range of implied fully diluted equity values per Share of Common Stock (rounded to the nearest $0.25):

| | Implied Value Per Share |
|---|---|
| EV/FY+3 Revenue | $ 14.00 - $21.50 |
| EV/FY+4 Revenue | $ 15.50 - $26.25 |

76.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations
of Section 14(d) of the Exchange Act and SEC Rule 14d-9**

77.     Plaintiff repeats all previous allegations as if set forth in full.

78.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting Ariad stockholders to tender their shares in the Offer.

79.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

80.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission renders the Recommendation Statement false and/or misleading.

81.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

82.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares if such misrepresentations and omissions are not corrected prior to the expiration of the Offer.  Plaintiff and Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

83.     Plaintiff repeats all previous allegations as if set forth in full.

84.     Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Tender Offer.

85.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender her shares pursuant to the Tender Offer.

86.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender her shares.

## COUNT III

**Class Claims Against the Individual Defendants for
Violation of Section 20(a) of the Exchange Act**

87.     Plaintiff repeats all previous allegations as if set forth in full.

88.     The Individual Defendants acted as controlling persons of Ariad within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Ariad and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

89.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

91.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

92.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor on behalf of Ariad, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: January 28, 2017

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, Massachusetts 02482
(781) 453-0100
mmatorin@matorinlaw.com

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system to be sent electronically to the registered participants on January 28, 2017.

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)